UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL COMPLAINT | RECEIVED |
| | : | | MARCH 24, 2021 |
| v. | : | Mag. No. 21-6014 (DEA) | At: XX 3:05PM |
| | : | | WILLIAM T. WALSH |
| FORD F. GRAHAM | : | | CLERK |

I, Julie Gettings, the undersigned complainant being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

SEE ATTACHMENT B

continued on the attached pages and made a part hereof.


    S/JULIE GETTINGS
JULIE GETTINGS
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION


Attested to by telephone pursuant to
Fed. R. Crim. P. 4.1(b)(2)(A) on March 24, 2021,
in the District of New Jersey


HONORABLE DOUGLAS E. ARPERT
UNITED STATES MAGISTRATE JUDGE

1

ATTACHMENT A

Count One
(Wire Fraud)

From in or about December 2012 until at least in or about September 2013, in Mercer County, in the District of New Jersey, and elsewhere, the defendant,

FORD F. GRAHAM,

knowingly and intentionally devised and intended to devise a scheme and artifice to defraud investment clients (the "Victims") to obtain money and property from the Victims by means of materially false and fraudulent pretenses, representations, and promises, and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice to defraud.

In violation of Title 18, United States Code, Sections 1343 and 2.

Count Two
(Securities Fraud)

From in or about December 2012 until at least in or about September 2013, in Mercer County, in the District of New Jersey, and elsewhere, the defendant,

FORD F. GRAHAM,

knowingly and willfully used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, namely, that defendant GRAHAM, among other things, received investment funds from the Victims and, rather than invest the funds in securities on the Victims' behalf, as he had represented to them, misappropriated the funds for his own personal use and to further his fraudulent scheme.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

Count Three
(Wire Fraud)

From in or about December 2017 to at least in or about February 2018, in Mercer County, in the District of New Jersey, and elsewhere, the defendant,

FORD F. GRAHAM,

knowingly and intentionally devised and intended to devise a scheme and artifice to defraud payment processing companies and other institutions and individuals to obtain money and property from those companies by means of materially false and fraudulent pretenses, representations, and promises, and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice to defraud.

In violation of Title 18, United States Code, Sections 1343 and 2.

<u>Count Four</u>
(Aggravated Identity Theft)

From in or about December 2017 to at least in or about February 2018, in Mercer County, in the District of New Jersey, and elsewhere, the defendant,

FORD F. GRAHAM,

knowingly transferred, possessed, and used, without lawful authority, the means of identification of another person, namely, Victim-3, during and in relation to a violation of federal law, namely, wire fraud, contrary to Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Sections 1028A and 2.

Count Five
(Aggravated Identity Theft)

From in or about December 2017 to at least in or about February 2018, in Mercer County, in the District of New Jersey, and elsewhere, the defendant,

FORD F. GRAHAM,

knowingly transferred, possessed, and used, without lawful authority, the means of identification of another person, namely, Victim-4, during and in relation to a violation of federal law, namely, wire fraud, contrary to Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Sections 1028A and 2.

Count Six
(Aggravated Identity Theft)

From in or about December 2017 to at least in or about February 2018, in Mercer County, in the District of New Jersey, and elsewhere, the defendant,

FORD F. GRAHAM,

knowingly transferred, possessed, and used, without lawful authority, the means of identification of another person, namely, Victim-5, during and in relation to a violation of federal law, namely, wire fraud, contrary to Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Sections 1028A and 2.

Count Seven
(Engaging in Unlawful Monetary Transactions)

On or about January 8, 2018, in Mercer County, in the District of New Jersey, and elsewhere, the defendant,

FORD F. GRAHAM,

knowingly engaged and attempted to engage in a monetary transaction involving criminally derived property of a value greater than $10,000 that was derived from a specified unlawful activity, namely, wire fraud, contrary to Title 18, United States Code, Section 1343, in that he caused to be electronically transferred approximately $11,491.22 in fraudulently obtained funds from a bank account that he controlled to a third-party bank account.

In violation of Title 18, United States Code, Section 1957.

Count Eight
(Conspiracy to Commit Wire Fraud)

From in or about November 2017 to in or about June 2018, in Mercer County, in Mercer County, in the District of New Jersey, and elsewhere, the defendant,

FORD F. GRAHAM,

knowingly and intentionally conspired with others to devise a scheme and artifice to defraud institutions and individuals to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice to defraud, contrary to Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Sections 1349.

ATTACHMENT B

I, Julie Gettings, am a Special Agent with the Federal Bureau of Investigation. I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, and items of evidence. Where statements of others are related herein, they are related in substance and in part. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged. Because this complaint is submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation.

I.      BACKGROUND

1.      At various times relevant to this criminal complaint:

a.      Defendant FORD F. GRAHAM ("GRAHAM") resided in or around Princeton, New Jersey, and held himself out as the owner, chief executive, chairman, manager, and/or principal member of dozens of corporate entities purporting to do business under, or that were otherwise affiliated with, an umbrella organization, Vulcan Capital Corporation, sometimes also referred to as the Vulcan Capital Group (hereafter, "Vulcan"). In this capacity, GRAHAM held himself out as a highly successful financier who had vast experience sponsoring complex energy and natural resource projects and other investment deals.

b.      The Vulcan family of entities, acting by and through defendant GRAHAM, purported to invest in energy and natural resource projects, and other investment projects, in the United States and other countries, including Nigeria, Turkey, Iraq, Bangladesh, and others.

c.      Co-conspirator 1 ("CC-1") was GRAHAM's spouse, who resided with defendant GRAHAM in or around Princeton, New Jersey.

d.      Co-conspirator 2 ("CC-2") was one of GRAHAM's associates, who resided in or around Mobile, Alabama.

e.      Victim-1 was an acquaintance of GRAHAM who resided in or around Princeton, New Jersey, and who invested a substantial amount of money with GRAHAM.

f.      Victim-2 was an acquaintance of GRAHAM who resided in or around Princeton, New Jersey, and who invested a substantial amount of money with GRAHAM.

g.     Victim-3 was an acquaintance of GRAHAM who resided in or around Princeton, New Jersey.

h.     Victim-4 was, between in or around 2009 and in or around 2014, Vulcan's chief financial officer.

i.     Victim-5 resided in or around Tempe, Arizona.

j.     Victim-6 was an electronic payment processing company headquartered in or around San Francisco, California.

k.     Victim-7 was a municipal public works agency located in or around Des Moines, Iowa.

l.     Victim-8 was a law firm located in or around Nantucket, Massachusetts.

m.     Victim-9 resided in or around Encinitas, California.

2.     Law enforcement has conducted an extensive criminal investigation of GRAHAM, which revealed GRAHAM's numerous schemes to defraud individuals and institutions out of significant sums of money between at least in or around 2012 and at least in or around 2019 (the "Relevant Period"). GRAHAM's criminal conduct involved at least three fraudulent schemes, described herein and referred to as the "Investment Scheme," the "Payment Processing Scheme," and the "Business E-Mail Compromise Scheme." These fraudulent schemes are referred to collectively herein as the "Fraudulent Schemes."

3.     The investigation has revealed that during the Relevant Period, GRAHAM used the Vulcan family of entities to commit the Investment Scheme by, among other things:  (i) attracting investors, including Victim-1, Victim-2, and others, to invest in securities and other investments for a variety of purported energy and natural resource projects, which GRAHAM promoted through material and fraudulent misrepresentations and omissions; (ii) misappropriating and converting substantial amounts of investor funds for GRAHAM's, CC-1's, and CC-2's personal use and benefit, rather than for the investment purpose for which those funds were intended; and (iii) disguising the Investment Scheme through the use of a dizzying number of Vulcan entities and bank accounts. Through the Investment Scheme, GRAHAM caused Victim-1, Victim-2, and other victims, to lose a total of more than $2.6 million.

4.     The investigation further revealed that GRAHAM used multiple Vulcan entities to perpetrate the Payment Processing Scheme. Through this scheme, GRAHAM caused the Vulcan entities fraudulently to charge stolen credit card numbers over Victim-6's electronic payment processing platform, as

well as other electronic payment processors' platforms. GRAHAM then quickly transferred or caused to be transferred money that had been credited to one or more external bank accounts that he and CC-1 controlled, before the cardholders reported the fraudulent charges and before Victim-6 could take appropriate action. As described below, GRAHAM used a variety of means to disguise the fraudulent charges, including by submitting fabricated invoices and other documents to Victim-6 to make it appear as though the charges were legitimate. Further, as described below, in furtherance of the Payment Processing Scheme, GRAHAM forged numerous individuals' signatures, including Victim-3, Victim-4, and Victim-5—and used other means of identification for those victims—on the fraudulent documentation that GRAHAM submitted to Victim-6. Through the Payment Processing Scheme, GRAHAM caused Victim-6 and other victims to lose tens of thousands of dollars.

5.     The investigation further revealed that in the Business E-Mail Compromise Scheme, GRAHAM conspired with other individuals to defraud victim institutions and individuals through fraudulent e-mail communications to induce those institutions to inadvertently and unknowingly wire millions of dollars in funds to bank accounts that GRAHAM and CC-1 controlled, which GRAHAM and his co-conspirators intended to misappropriate for their own benefit, use, and enrichment.

6.     GRAHAM's acts in furtherance of the Fraudulent Schemes are further described below.

II.     THE INVESTMENT SCHEME

7.     The investigation revealed that during the Relevant Period, GRAHAM solicited, on behalf of Vulcan and a number of its affiliated entities, millions of dollars in investments from high net worth investors, including, but not limited to, Victim-1 and Victim-2, in connection with several purported oil and natural resource projects.

8.     GRAHAM obtained large amounts of this money through material misrepresentations and omissions, and he fraudulently misappropriated and converted substantial sums of the investments for his own personal use and benefit, for the benefit of CC-1 and CC-2 and other confederates, and/or to repay other investors in a Ponzi-like fashion.

9.     As a result of the Investment Scheme, victim investors have suffered significant investment losses. One victim in particular, Victim-1, lost more than $2 million through a series of investments he made with GRAHAM in and around 2013, in connection with a purported securities investment in an oil company in southern Alabama. GRAHAM induced Victim-1's investments through material misrepresentations and omissions about the

purported investment and the purposes for which Victim-1's investment money would be used. Victim-1 relied on GRAHAM's material misrepresentations and omissions in making his investment decisions.

10.     Beginning in or around December 2012 and continuing into January 2013, GRAHAM began soliciting an investment from Victim-1 that Vulcan and one of its affiliates, Aries Energy Group ("Aries"), purportedly were sponsoring. According to GRAHAM, this investment opportunity would be in a secured convertible promissory note that would be issued by another entity, CCC Holdings, LLC ("CCC"). CCC, in turn, would use the capital invested to acquire a controlling equity stock interest in another entity, Specialty Fuels Bunkering, LLC ("SFB"), an oil bunkering business located in or around Mobile, Alabama. According to GRAHAM, SFB was at that time undergoing a management dispute between its two existing owners—CC-2 and another individual, referred to herein as the "Other Owner." Victim-1's investment, according to GRAHAM, ultimately would allow GRAHAM, Victim-1, CCC, and CC-2 to oust the Other Owner as an owner and manager of SFB and return the company to profitability. To induce Victim-1 to invest, GRAHAM represented to Victim-1 that he (GRAHAM) and CC-1 would be investing $500,000 of their own personal funds in the SFB transaction.

11.     On or about January 9, 2013, GRAHAM, using a Vulcan e-mail account that he used and controlled (the "Vulcan e-mail account"), e-mailed Victim-1 to follow up on an earlier conversation regarding the investment opportunity. GRAHAM stated in the e-mail, "We would really like to have you join us and believe you will appreciate the reward that comes from building the company into even a profitable business." GRAHAM emphasized that "I would like to move with speed in this case as I mentioned."

12.     At a meeting in or around early January 2013, GRAHAM provided Victim-1 an informational memo, bearing an Aries letterhead and GRAHAM's name and contact information, regarding the investment (the "SFB Offering Memo"). The SFB Offering Memo described SFB and its history, and represented that, notwithstanding the ongoing management dispute between CC-2 and the Other Owner, SFB was profitable and well capitalized and would be a profitable investment once the Other Owner was removed. The SFB Offering Memo further explained that CCC—acting through CC-2, who then owned 100% of CCC—previously had contracted to acquire a 52% majority share of SFB's stock, but that the Other Owner had theretofore prevented CC-2's takeover efforts on the basis that CCC had not completed paying for the stock.

13.     Thus, according to the SFB Offering Memo that GRAHAM provided Victim-1, CCC was seeking capital to complete the purchase of 52% of SFB stock shares so that the Other Owner could be removed. The SFB Offering Memo explained the details of the investment as follows:

> CCC has one immediate goal: to raise $2 mm that will allow it to complete the purchase of the 52% of the stock. This would allow CCC to control the Company [SFB] and put the Company on the position to dramatically grow and expand[.] CCC had reached agreement with an investor in November, on this goal, but that investor proved to not have the funds to close the transaction. CCC is seeking to complete its immediate goal before 2013. . . .  CCC is seeking accredited investors for a $2 mm secured note (the "Investment" or the "Debt") with a 1-year term and a 15% coupon and equity participation. CCC has no long-term debt with potential equity participation and would pledge the stock in the Company as collateral. CCC would expect to repay the Debt Holder with its share of distributions from the Company.

The putative investment would give Victim-1 an interest-bearing note—which the SFB Offering Memo described as "a highly collateralized note that would pay attractive rates"—that Victim-1 could convert into an equity share of CCC and, thereby, an equity share of SFB.

14.     GRAHAM also provided to Victim-1 a document with the heading that read, "Ownership Analysis." This document purported to represent the various ownership interests in CCC and SFB following Victim-1's anticipated investment. Among other things, this document represented that, with his $1.5 million investment in CCC, Victim-1 would own 42.857% of CCC, which would translate to a 22.286% ownership interest in SFB. The document further indicated that with GRAHAM's personal investment of $500,000, "NEH"— initials that, in context, likely stood for "Nassau Energy Holdings," a purported Vulcan affiliate—would own 14.286% of CCC, and therefore would own 7.42% of SFB. Based on this document and GRAHAM's other representations, Victim-1 believed that GRAHAM and CC-1 personally were investing in SFB stock, which gave Victim-1 comfort with the investment. Indeed, in a follow-up e-mail from the Vulcan e-mail account on or about January 11, 2013, GRAHAM again represented to Victim-1 that he would also be investing in SFB: "Also, I will be signing identical documents as you will (with obviously lower capital amounts)."

15.     Based on GRAHAM's various representations, Victim-1 agreed initially to invest $1.5 million in the CCC note, and by extension, in SFB stock. Consistent with the representation in the SFB Offering Memo and GRAHAM's representations to him, Victim-1 did so on the understanding and belief that his investment money would be used for the sole purpose of completing CCC's acquisition of SFB stock. Victim-1 did not agree to fund expenditures for consultants, attorneys, litigation, or any other projects, or agree that the money would be used for any other purpose. Nor did Victim-1 agree that any of his investment money would be used to pay GRAHAM fees or any other

compensation. Indeed, GRAHAM expressly represented to Victim-1 that he would not be taking a fee from Victim-1's investment money. Victim-1 also did not agree that his investment money would be used for GRAHAM's personal expenses or use, and GRAHAM made no representations that he would use Victim-1's investment money for his (GRAHAM's) personal use.

16.    On or about January 11, 2013, GRAHAM, using the Vulcan e-mail account, e-mailed Victim-1 a set of transaction documents to execute the investment in SFB. After GRAHAM made minor changes to the documents that Victim-1 requested, Victim-1 executed the various documents, and GRAHAM and CC-2 executed the documents on behalf of CCC. On or about January 14, 2013, acting pursuant to the wire instructions provided to Victim-1 in the SFB transaction documents, Victim-1 wired $1.5 million to a bank account ending in 9078, held in the name of Specialty Fuels America, LLC ("SFA")—a name similar to SFB—which GRAHAM controlled (the "SFA 9078 account").

17.    The investigation revealed that in furtherance of the Investment Scheme and to induce Victim-1 to invest in the SFB transaction, GRAHAM made material misrepresentations and omissions to Victim-1 regarding the investment. Most prominently, the investigation revealed that Victim-1's investment money never was used to purchase SFB stock, as GRAHAM had represented orally and in writing. And Victim-1 received no documentation confirming that SFB shares had been purchased with his investment money. Rather, as described below, the investigation revealed that GRAHAM embezzled, converted, and misappropriated substantial portions of Victim-1's investment for other purposes without Victim-1's knowledge or authorization, including for GRAHAM's, CC-1's, and CC-2's own personal benefit, use, and enrichment.

18.    Law enforcement has analyzed bank records for the SFA 9078 account before and after Victim-1 made his initial $1.5 million investment. At the time that Victim-1's $1.5 million transfer posted to the SFA 9078 account on or about January 14, 2013, the account had a balance of $10.00. Between that date and on or about April 25, 2013, no additional deposits were received in the SFA 9078 account. Given the minimal balance in the account at the time Victim-1's investment money was deposited, all outgoing transfers and payments from the SFA 9078 account during this time period were traceable directly to Victim-1's investment money.

19.    Almost immediately after Victim-1's investment money posted to the SFA 9078 account, GRAHAM made or caused to be made numerous transfers and payments out of the SFA 9078 account that were, *inter alia*: (i) transfers to another Vulcan-affiliated account that GRAHAM controlled; (ii) transfers to a personal account that GRAHAM and/or CC-1 controlled; (iii) transfers to an account that CC-2 controlled; and (iv) transfers and payments to other individuals and entities that were entirely unrelated to CCC

10

or SFB. Specific examples of GRAHAM's misappropriation of Victim-1's initial investment money, which were contrary to the representations that GRAHAM made to Victim-1 regarding the use of the initial investment money, are described in sub-paragraphs (a) through (k), below.

a.      Between in or around January 2013 and in or around April 2013, GRAHAM transferred or caused to be transferred more than $400,000 from the SFA 9078 account to a bank account ending in 0858, held in the name of Vulcan Energy International, LLC (the "VEI 0858 account"), which GRAHAM controlled. At the time that these transfers began, the VEI 0858 account had a negative balance of approximately $321. Between on or about January 14, 2013 and on or about April 25, 2013, the VEI 0858 account received no other incoming deposits (with the exception of one *de minimis* credit for $3.00). Consequently, all of the funds received in the VEI 0858 account during this period, and all payments out of that account during this period (save for $3.00), were traceable directly to Victim-1's $1.5 million investment.

b.      Between in or around January 2013 and in or around April 2013, GRAHAM transferred more than $106,000 of Victim 1's investment money—either directly from the SFA 9078 account or indirectly through the VEI 0858 account—to a bank account held by CC-1 ("CC-1's account"). CC-1's account, in turn, was used almost exclusively for GRAHAM's and CC-1's personal benefit. Three examples of expenditures from CC-1's account, each of which is directly traceable to Victim-1's initial investment, are illustrative of GRAHAM's misappropriation of Victim-1's investment money:

i.      On or about January 14, 2013, after GRAHAM had transferred to CC-1's account $20,000 from the VEI 0858 account, GRAHAM and/or CC-1 made a payment of $14,540 to a local private school for tuition for one of their children.

ii.      GRAHAM and CC-1 spent more than $16,000 on a Caribbean vacation using Victim-1's initial investment. Specifically, on or about February 21, 2013—the day after GRAHAM transferred or caused to be transferred $20,000 from the VEI 0858 account to CC-1's account—an outgoing transfer for $6,684 was made from CC-1's account to a resort in Antigua. Evidencing the personal nature of this payment, on or about March 22, 2013, GRAHAM sent an e-mail to Victim-1 noting that he would be "head[ing] to islands next week and [would be] tak[ing] her [CC-1's] mother with us to take her mind off her tragedy. Only man she has known for 50 years – very sad." (GRAHAM was referring to the death of his father-in-law.) GRAHAM's e-mail to Victim-1 omitted that GRAHAM's and his family's personal trip to "the islands" had been funded using Victim-1's investment money.

   iii. On or about March 14, 2013, two checks, totaling $9,251.40 and made payable to a local contractor, were drawn on CC-1's account. The memo section of one of these checks to the contractor read, "pergola etc-". On or about the same day, GRAHAM transferred or caused to be transferred $9,250.00—almost exactly the amount transferred to the contractor—from the VEI 0858 account to CC-1's account.

   c. On or about January 22, 2013, GRAHAM transferred or caused to be transferred $42,274.46 from the VEI 0858 account to a health insurance company. The investigation revealed that this and other payments to the insurance company were for health insurance premiums for GRAHAM, his family, and other Vulcan employees.

   d. On or about April 5, 2013, GRAHAM transferred or caused to be transferred $15,000 from the SFA 9078 account to the VEI 0858 account. On or about April 8, 2013, he transferred or caused to be transferred $14,000 to CC-1's account from the VEI 0858 account. The following day, there was a $3,000 transfer from CC-1's account to a summer camp for girls age 7-17 in the western hills of North Carolina. A subsequent check from CC-1's account to the summer camp read, "[GRAHAM's daughter's name] – June" in the memo section, thus indicating that the payments to the summer camp were for GRAHAM's daughter's attendance.

   e. On or about April 12, 2013, GRAHAM transferred or caused to be transferred $6,007.79 from the SFA 9078 account to an account held by CC-1's mother.

   f. On or about April 22, 2013, the VEI 0858 account was used to pay, by debit card, $406.60 for the purchase of a lazy susan decorated with images of pigs from a local jewelry store in Princeton, New Jersey.

   g. Between on or about January 16, 2013 and on or about April 26, 2013, GRAHAM transferred or caused to be transferred a total of $21,000 from the VEI 0858 account to a personal account controlled by GRAHAM and CC-1.

   h. On or about April 4, 2013, GRAHAM transferred or caused to be transferred $230,000 from the SFA 9078 account to an account held by another GRAHAM investor, Victim-2. A few days later, on or about April 9, 2013, GRAHAM transferred or caused to be transferred another $3,689.12 to Victim-2's account. GRAHAM previously had solicited and obtained hundreds of thousands of dollars in investments from Victim-2 for other purported Vulcan projects. The investigation revealed that these payments to Victim-2 reflected GRAHAM's misappropriation of Victim-1's investment money to repay, in a Ponzi-like fashion, Victim-2 for prior investments. The investigation

similarly revealed that, as with Victim-1, GRAHAM fraudulently misappropriated significant sums of Victim-2's investment money as well.[1]

      i.    Between on or about January 14, 2013 and on or about April 29, 2013, GRAHAM transferred or caused to be transferred a total of approximately $395,000 to an account controlled by CC-2. Although CC-2 was a principal of SFB and nominally was the owner of CCC, CC-2's subsequent expenditures from that account revealed transactions that were largely personal in nature. Indeed, law enforcement has identified few (if any) transactions out of CC-2's account that were related any in way to the SFB transaction.[2]

      j.    Between on or about January 14, 2013 and on or about April 9, 2013, GRAHAM transferred or caused to be transferred approximately $17,600 from the VEI 0858 account to a third-party company to pay rent for Vulcan's New York offices.

      k.    Between on or about January 14, 2013 and on or about April 4, 2013, GRAHAM transferred or caused to be transferred (through wire transfer and check) more than $54,000 to Victim-4, Vulcan's chief financial officer, and Victim-4's spouse, which reflected Victim-4's compensation. (As described in Section III, below, GRAHAM, without lawful authority, forged Victim-4's signature on multiple documents in furtherance of the Payment Processing Scheme.)

    20.    The foregoing are non-exhaustive examples of GRAHAM's fraudulent misappropriation of Victim-1's initial investment money. These and other unauthorized transfers out of the SFA 9078 account, the VEI 0858 account, and CC-1's account are inconsistent with the stated purpose of Victim-1's investment—the acquisition of a controlling interest in SFB stock—which was the sole purpose for which GRAHAM represented the funds would be used. Moreover, GRAHAM's movement of money from one Vulcan-controlled account (SFA 9078) to another Vulcan-controlled account (VEI 0858), followed by personal expenditures unrelated to the SFB transaction and transfers to personal accounts, themselves were designed to disguise GRAHAM's misappropriation of Victim-1's money.

---

[1]    Using Victim-1's initial investment money, GRAHAM also made or caused to be made other money transfers to individuals to whom GRAHAM owed money for reasons unrelated to the SFB transaction.

[2]    Before a $150,000 transfer on January 14, 2013 from the SFA 9078 account to CC-2's account, CC-2's account balance had been under $500 for over several months, with minimal activity. On the same day that he received $150,000 from the SFA 9078 account, CC-2 wrote a check to a private school for $30,000, where CC-2's daughters attended.

21.     After Victim-1's initial investment, GRAHAM continued soliciting additional funds from Victim-1. In or around March 2013, GRAHAM represented to Victim-1, among other things, that the SFB acquisition had been delayed due to obstructionist efforts by the Other Owner that had led to litigation. For example, on or about March 29, 2013, GRAHAM, using the Vulcan e-mail account, sent Victim-1 an e-mail that read, in part:

> We are making good progress, but taking longer than would have hoped. Hearing for forcing stock purchase to be concluded in LA was pushed back to April 11. Judge was busy on earlier scheduled date. We have taken discovery and they cannot stop the sale to us. . . .
>
> Hearing to remove [the Other Owner] in AL, was partially held. "Partially" meaning the new judge said "why don't you guys meet and work this out.  If you cannot, I will rule on my next date for hearing (late April)."
>
> In meantime, the injunctions by the Judge on what can be done with company and its assets or cash remain in place. Company continues to operate at almost same pace as last year. We are watching it like a hawk every day. Expect closure in April on both fronts. Then we get to make Company grow . . . .

Victim-1 was surprised upon receipt of this e-mail. This was the first time that Victim-1 learned that there had been difficulties in the transaction. Indeed, until then, Victim-1 had been unaware of any litigation regarding control of SFB, and GRAHAM had not mentioned any such litigation. Thereafter, GRAHAM's communications with Victim-1 largely involved GRAHAM providing purported updates on the status of the ongoing litigation and takeover efforts, which, GRAHAM advised, would require additional funds.

22.     In or around April 2013, Victim-1 was scheduled to receive his first interest payment under the CCC convertible note, but Victim-1 did not receive it. In a series of e-mails on or about May 29, 2013 and May 30, 2013, GRAHAM represented to Victim-1 that "My CFO confirmed we mailed out check early April," and that a replacement check would be sent to Victim-1 at his address. Victim-1, however, never received a replacement check. Indeed, at no time did Victim-1 ever receive an interest payment in connection with the CCC note in which he invested.

23.     In the months following Victim-1's initial investment, between in or around June 2013 and in or around September 2013, GRAHAM solicited an additional $740,000 from Victim-1 to cover purported litigation, consulting, and other costs that, GRAHAM represented, were incurred due to ongoing litigation and unexpected delays in the acquisition of SFB. With respect to

these subsequent payments, GRAHAM represented that Victim-1 would be reimbursed these funds immediately upon CCC's takeover of SFB.

24.     For example, in a letter to Victim-1 dated June 16, 2013, GRAHAM represented that an estimated $200,000 to $250,000 would be necessary to pay for "lawyers, accountants and forensic auditors" in support of the takeover litigation to "get this action completed." GRAHAM further represented that he was "highly confident that we will have control of the company before end of Q3." In this letter, GRAHAM further represented that Victim-1 would be fully reimbursed for any capital contribution that Victim-1 made in furtherance of the continued takeover effort. Based on GRAHAM's representations, and seeking to avoid a loss on his initial investment, on or about June 18, 2013, Victim-1 wired to the SFA 9078 account $125,000, and on or about July 9, 2013, Victim-1 wired another $100,000 to the SFA 9078 account.[3]

25.     On or about July 25, 2013, GRAHAM sent a similar letter to Victim-1, representing that the takeover process would be "concluded this summer," but requesting an additional contribution from Victim-1 in order to pay for "lawyers, accountants, and forensic auditors." GRAHAM again represented that Victim-1 would be reimbursed for any additional contributions that he made. Based on these representations, on or about July 26, 2013, Victim-1 wired another $150,000 to the SFA 9078 account. GRAHAM made similar representations in subsequent months and, as a result, Victim-1 wired an additional $365,000 to the SFA 9078 account, believing that this money was being used in support of ongoing efforts to finalize CCC's takeover of SFB.

26.     As with Victim-1's initial investment, GRAHAM fraudulently misappropriated substantial portions of Victim-1's subsequent investment money for GRAHAM's and his confederates' own personal use, benefit, and enrichment.

27.     At the time that Victim-1 wired $125,000 to the SFA 9078 account on or about June 18, 2013, the SFA 9078 account had a negative balance of approximately $5.96. Aside from two *de minimis* transfers from the VEI 0858 account totaling $60.00, the only other deposit in the SFA 9078 account between on or about June 18, 2013 and on or about July 18, 2013 was Victim-1's additional investment of $100,000, made on or about July 9, 2013. Accordingly, all outgoing transfers from the SFA 9078 account between on or about June 18, 2013 and on or about July 18, 2013 were traceable directly to Victim-1's $225,000 in investments during this period. Specific examples of

---

[3]     Victim-1 made this second $100,000 transfer at GRAHAM's request to reimburse CC-2 for purported legal, investigative, and security costs that CC-2 had incurred in connection with the SFB takeover. Victim-1 agreed to the reimbursement to CC-2 to cover these purported expenses, but Victim-1 did not agree to pay CC-2's personal living expenses.

GRAHAM's misappropriation of Victim-1's additional investments are described in sub-paragraphs (a) through (c), below:

      a.    On or about June 20, 2013, GRAHAM made or caused to be made two withdrawals from the SFA 9078 account totaling $14,934.00, one for $8,500.00 and the other for $6,434.00. The same day, $6,434.00 in cash was deposited into CC-1's account.

      b.    Between on or about June 19, 2013 and on about July 8, 2013, GRAHAM transferred or caused to be transferred approximately $45,000 to an account controlled by CC-2. Law enforcement's review of that account revealed substantial amounts of expenditures by CC-2 that had nothing to do with SFB.

      c.    Between on or about June 21, 2013 and on about July 11, 2013, GRAHAM transferred or caused to be transferred a total of approximately $50,750 from the SFA 9078 account to the VEI 0858 account which, at the close of June 21, 2013, had a balance of approximately $810.27. From there, GRAHAM made or caused to be made (by way of example) the following transfers and withdrawals out of the VEI 0858 account, a majority of which were traceable to Victim-1's investments, and all of which are inconsistent with an investment in SFB:

      i.    Between or about June 21, 2013 and or about July 1, 2013, Victim-4 was paid a total of $11,950.00 in compensation.

      ii.    On or about June 27, 2013, GRAHAM transferred or caused to be transferred $6,434.00 to CC-1's account, which, at the time of the transfer, had a balance of $1,666.00. Subsequent expenditures from CC-1's account included, for example, a payment of $500 to a local university; a $1,000 cash withdrawal; multiple payments to an online retailer and a local grocery store; a payment of $187.25 to a mosquito exterminator; and a payment of $473.48 to a luxury beauty retailer.

      iii.    On or about July 2, 2013, GRAHAM transferred or caused to be transferred $5,500 to a Vulcan account held in Nigeria under the name Vulcan Minerals & Power, Ltd. ("Vulcan Minerals"). During the Relevant Period, GRAHAM purported to do large volumes of business in Nigeria through Vulcan Minerals. The investigation identified no connection, however, between the Vulcan Minerals account held in Nigeria (or GRAHAM's purported Nigerian business more generally) and the SFB transaction.

      iv.    On or about July 9, 2013, GRAHAM paid or caused to be paid $4,400.00 in rent payments for Vulcan's New York offices.

v.      On or about July 10, 2013, GRAHAM paid or caused to be paid $470.80 to a bicycle shop located in or around Princeton, New Jersey.

vi.     On July 11, 2013, GRAHAM made or caused to be made an in-branch withdrawal from the VEI 0858 account in the amount of $6,434.00. The same day, the same amount was deposited, in cash, into CC-1's account.

28.     Likewise, GRAHAM misappropriated large amounts of the subsequent investments in SFB that Victim-1 made between or about July 26, 2013 and or about September 9, 2013, which totaled approximately $515,000. At the time of Victim-1's wire transfer to the SFA 9078 account on July 26, 2013, that account had a balance of approximately $118.93. From that date through on or about September 9, 2013, the SFA 9078 account received no additional deposits other than Victim-1's additional investments on August 8, 2013 and September 9, 2013—except for one incoming transfer from another Vulcan account for $1,500. Accordingly, the vast majority of outgoing transfers from the SFA 9078 account between or about July 26, 2013 and on or about September 16, 2013 were traceable directly to Victim-1's $515,000 in additional investments during this period. Specific examples of GRAHAM's fraudulent misappropriation of Victim-1's investment money during this period are described in sub-paragraphs (a) through (d), below:

a.      Between or about July 26, 2013 and or about September 9, 2013, GRAHAM transferred or caused to be transferred a total of $66,000 from the SFA 9078 account to an account controlled by CC-2. Law enforcement's review of that account reviewed substantial amounts of CC-2's personal expenditures from the account. As two examples, after receiving the transfers from the SFA 9078 account, on or about August 8, 2013, CC-2 paid approximately $3,608.90 from that account to Harrah's New Orleans and, on August 13, 2013, CC-2 made a payment of approximately $15,086.03 from that account to the private school where CC-2's daughters attended.

b.      On or about August 14, 2013, GRAHAM made or caused to be made a payment of $1,038.63 from the SFA 9078 account to an entity in Istanbul, Turkey, while there on a trip with his son.

c.      Between or about July 29, 2013 and or about September 13, 2013, GRAHAM transferred or caused to be transferred a total of $237,600 from the SFA 9078 account to the VEI 0858 account. Examples of subsequent transactions out of the VEI 0858 account during this time period, almost all of which were traceable directly to Victim-1's investment money, are as follows:

i.      GRAHAM transferred or caused to be transferred a total of $18,651.00 from the VEI 0858 account to CC-1's account.

ii.     GRAHAM transferred or caused to be transferred a total of $40,500 to the Vulcan Minerals account held in Nigeria.

iii.    GRAHAM paid or caused to be paid more than $8,800 in rent for Vulcan's New York offices.

iv.     GRAHAM paid or caused to be paid Victim-4 at least $14,800 in compensation.

v.      GRAHAM paid or caused to be paid a health insurance company at least $4,277.70 in premiums for health insurance for himself, his family, and Vulcan employees.

vi.     GRAHAM spent or caused to be spent at least $25,000 on three trips that he and his family members took in and around August 2013 and September 2013:  one to Turkey (in which GRAHAM brought his son), one to Florida with his entire family, and a third trip to Florida with a troupe of boy scouts. In or around August 2013, the VEI 0858 account incurred debits of $8,249.65 to United Vacations; a debit for $7,800 for airline tickets; miscellaneous debits in Turkey totaling at least $7,200, and miscellaneous expenses totaling more than $3,000 for the Florida trips. Confirming the personal nature of these trips, in an e-mail to Victim-1 on or about August 8, 2013, GRAHAM told Victim-1 that he was then in Turkey. On or about August 16, 2013, in another e-mail, GRAHAM told Victim-1, "We are Just landed back from Turkey – Partially victorious.  [GRAHAM's son] wide-eyed from trip. Makes him appreciate home so much more." In the same e-mail, GRAHAM said, "I am taking 16 boy scouts on to Sea Base at 5 AM for next 7 days." Similarly, in an e-mail to Victim-1 on or about August 29, 2013, GRAHAM stated that he was "[l]eaving for Florida on 6 AM flight with family and kids on Friday." GRAHAM did not disclose to Victim-1 in these communications that these trips had been funded using Victim-1's SFB investment money.

d.      On or about August 27, 2013, GRAHAM transferred or caused to be transferred approximately $27,800 from the SFA 9078 account to another account that he controlled, ending in 4669 and operating under the name Aries Energy Group (the "AEG 4669 account"). At the time of this transfer, the AEG 4669 account had a balance of approximately $184.01. The day after the transfer, an electronic payment from the AEG 4669 account was made to Tuition Management Systems in the amount of $27,626.52. The investigation revealed that this payment was for GRAHAM's daughter's private school tuition.

29.     Based on the investigation, there is probable cause to believe that GRAHAM fraudulently misappropriated substantial amounts of Victim-1's

investment money for GRAHAM's own personal use, benefit, and enrichment, unbeknownst to Victim-1 and without his authorization.

30.     During the Relevant Period, GRAHAM made numerous material misrepresentations in his oral and written communications with Victim-1 throughout 2013 to, among other things, (i) disguise GRAHAM's misappropriation of Victim-1's initial investment money; (ii) avoid or delay having to make interest payments to Victim-1 on the convertible promissory note; and (iii) induce Victim-1 to make the additional $740,000 investments described above, large portions of which GRAHAM also misappropriated. Moreover, GRAHAM's communications with Victim-1 throughout 2013 fraudulently omitted that GRAHAM had misappropriated, and was misappropriating, large amounts of Victim-1's investment money for GRAHAM's own personal use, benefit, and enrichment.

31.     Victim-1 never received an interest payment from GRAHAM, SFB, CCC, or any other source on his convertible promissory note issued from his initial investment of $1.5 million, and Victim-1 never received reimbursement for the subsequent $740,000 in investments that he made thereafter. In total, Victim-1 lost at least $2,240,000 in connection with the SFB transaction.

32.     For the foregoing reasons, there is probable cause to believe that GRAHAM executed the fraudulent Investment Scheme. Moreover, other victims, including Victim-2, also suffered significant investment losses similar in nature to those that GRAHAM inflicted upon Victim-1, as described herein. These losses resulted from similar material misrepresentations and omissions that GRAHAM made to Victim-2 and other victims regarding purported energy, oil, and other investment deals, which GRAHAM used to induce Victim-2 and other victims to invest substantial sums. The investigation revealed that, as with Victim-1, GRAHAM fraudulently misappropriated significant sums of Victim-2's and other victims' investment money for his own personal benefit, use, and enrichment.

III.    THE PAYMENT PROCESSING SCHEME

33.     Between in or around December 2017 and in or around February 2018, GRAHAM also used at least two entities that he created, RIM Enterprises LLC ("RIM") and Diomedes Partners, Ltd. ("Diomedes"), to perpetrate the Payment Processing Scheme. In this scheme, GRAHAM caused RIM and Diomedes to process, using Victim-6's payment processing platform, fraudulent charges on stolen credit card numbers that GRAHAM had obtained. As part of Victim-6's daily settlement process, money credited to GRAHAM's accounts at Victim 6 was deposited into external bank accounts that GRAHAM controlled, and then was transferred elsewhere, before the cardholders and Victim-6 could take action. As part of the scheme, GRAHAM submitted false and fraudulent documentation, including fabricated invoices and credit card

authorization forms, fabricated e-mails, forged signatures, altered bank statements, and other false and fraudulent information. The investigation revealed that GRAHAM's Payment Processing Scheme caused tens of thousands of dollars of monetary losses to Victim-6 and other payment processing companies, and also victimized Victim-3, Victim-4, Victim-5, and others through the unauthorized use of their personal identification information.

A.    Overview of Victim-6's Payment Processing Platform

34.    Victim-6 operates an electronic payment processing platform that allows merchants (often small businesses and individuals) quickly to process credit card payments using a card reader attached to a mobile device, such as a smartphone or tablet, or by manually inputting a card number through Victim-6's mobile application. When a merchant processes a credit card for payment, Victim-6 credits the corresponding amount to the merchant's Victim-6 account, and causes the cardholder's credit card to be charged for that amount. Victim-6 ultimately is reimbursed for the amount credited through the purchaser's bank. Victim-6 also collects a fee from the merchant for every transaction processed. On a daily basis, Victim-6 causes the money then in the merchant's Victim-6 account to be deposited into the merchant's external bank account linked to the Victim-6 account.

35.    When a merchant creates an account with Victim-6, Victim-6 requires the merchant to provide certain information, including, among other things, name, address, telephone number, e-mail address, and other related information. To manage risk, Victim-6 verifies the merchant's identity and will request additional personal information as necessary, such as a driver's license number, social security number, and date of birth. When a merchant accesses its Victim-6 account to settle funds, Victim-6 collects bank account and payment card numbers and information about the merchant's financial institution. In some cases, Victim-6 also requires merchants to submit certain documentation to verify the nature and validity of the merchant's business.

B.    RIM Enterprises

36.    On or about January 10, 2018, two merchant accounts were established with Victim-6 under the name RIM Enterprises LLC. With respect to both accounts, the following information (among other information) was submitted to Victim-6 as associated with the accounts:

| | |
|---|---|
| Merchant Name: | RIM Enterprises LLC |
| Name: | [Victim-3] |
| Address: | [Victim-3's address], Princeton, New Jersey |
| Email: | [e-mail address containing Victim-3's initials] |
| Business type: | Consultant |

In connection with RIM's account setup, Victim-3's actual date of birth, social security number, and telephone number were provided to Victim-6. As explained below, law enforcement has identified Victim-3 as an acquaintance of GRAHAM.

37.     Despite the information provided to Victim-6 indicating that the RIM accounts were opened, controlled, and operated by Victim-3, law enforcement's investigation revealed that GRAHAM, not Victim-3, opened and operated the RIM accounts and had full control over them. Indeed, the investigation revealed that GRAHAM opened and operated the RIM accounts without Victim-3's knowledge. The investigation further revealed that GRAHAM, not Victim-3, caused the RIM accounts fraudulently to charge stolen credit card numbers for goods or services that RIM did not, in fact, provide.

38.     According to records that law enforcement obtained from Victim-6, multiple transactions on the RIM accounts were executed from a device assigned an Internet Protocol ("IP") address ending in 125 (the "125 IP Address"). The investigation revealed that the 125 IP Address was assigned to an internet account subscribed in GRAHAM's name and at his residence in Princeton, New Jersey.

39.     Additionally, the investigation revealed that GRAHAM created the e-mail address that was provided to Victim-6 as a point of contact for RIM. That e-mail address, which contained Victim-3's initials, was designed to create the appearance that Victim-3 operated the RIM accounts, and to disguise GRAHAM's connection to them. The e-mail address was created on or about January 10, 2018, the same date that the RIM accounts were established at Victim-6. The e-mail account was created using Victim-3's name, but from a device accessing the 125 IP Address—again, the IP address associated with GRAHAM's internet service account at his Princeton residence.

40.     Moreover, the investigation revealed that GRAHAM's own e-mail account was listed as the "recovery e-mail" for the Victim-3 e-mail account, further indicating that GRAHAM, not Victim-3, created and controlled the account.

41.     Additionally, the external bank account linked to the RIM accounts was a bank account ending in 2792 (the "RIM 2792 account"), which GRAHAM, not Victim-3, established in December 2017 in the name of RIM Enterprises LLC. The mailing address for the RIM 2792 account was listed as 75 Rockefeller Plaza, New York, New York, which was the former location of Vulcan's offices. According to bank records that law enforcement obtained during the investigation, the RIM 2792 account was controlled by GRAHAM and CC-1. Indeed, Victim-3 is not, and never has been, a signatory on the RIM 2792 account.

42.     In or around early January 2018, Victim-6 requested that RIM provide certain documents and information to verify the business's legitimacy. On or about January 12, 2018, in response to that request, Victim-6 received from RIM the following materials, among other things:  (i) a statement describing RIM's line of business as being in the area of personal security consulting and self-defense training, which included several websites advertising and profiling Victim-3's business in that sector; (ii) bank statements from October 2017 through December 2017, purportedly for the RIM 2792 account; (iii) a scanned image of Victim-3's passport; and (iv) incorporation documents for RIM. These materials were faxed to Victim-6 from a fax number ending in 0965 (the "0965 fax number"). The investigation revealed that the 0965 fax number was assigned to an account registered to GRAHAM's residence in Princeton.

43.     There is probable cause to believe that GRAHAM, not Victim-3, submitted these materials to Victim-6 to validate RIM as a legitimate merchant, but that the materials contained false, fraudulent, and misleading information, which GRAHAM made in furtherance of the Payment Processing Scheme. For instance:

        a.      The investigation revealed that the bank statements submitted to Victim-6 were fraudulent. Specifically, the bank statements submitted to Victim-6 were purportedly for the RIM 2792 account, but they were addressed to RIM Enterprises LLC at Victim-3's business address in Bordentown, New Jersey. As noted above, however, the account was controlled by GRAHAM, not Victim-3, and the address actually associated with the account was Vulcan's former headquarters in New York City. Accordingly, as noted above, the real bank statements for the RIM 2972 account were addressed to the New York address, not the address listed in the statements that GRAHAM submitted to Victim-6.

        b.      Moreover, the transactions identified in the real bank statements for the RIM 2792 account do not match the transactions listed in the purported bank statements submitted to Victim-6 to validate RIM's business. Indeed, GRAHAM actually established the RIM 2792 account in or around December 2017, yet RIM submitted purported bank statements for that account for the period between October 2017 through December 2017. Moreover, the transactions in the altered RIM 2792 bank statements falsely reflected transactions consistent with the self-defense training services that RIM purportedly offered, when in fact no such transactions actually occurred in the RIM 2792 account.[4]

_____

[4]      The account opening paperwork for the RIM 2792 account said nothing about RIM doing business in the area of self-defense training or personal security services. To the contrary, the account opening paperwork, which GRAHAM and CC-1 signed, represented that the industry in which RIM was engaged was "Finance and Insurance," and described RIM's business as a "financial advisor."

c. The statement submitted to Victim-6 describing RIM's business generally was consistent with the martial arts business that Victim-3 operated in fact. More specifically, Victim-3 operated a martial arts business in central New Jersey. However, the investigation revealed that Victim-3 had no affiliation with, or knowledge of, RIM, and that Victim-3 never had any ownership interest in, or control of, a bank account held in RIM's name. Nor did Victim-3 provide any martial arts or self-defense-related services to anyone on behalf of RIM, GRAHAM, or any other Vulcan entity.

d. Likewise, the investigation revealed that Victim-3 did not authorize GRAHAM to use his passport or personal identifying information to create or operate a business.

e. The incorporation documents for RIM submitted to Victim-6 also bore Victim-3's name and signature. Victim-3 did not, however, sign any incorporation documents concerning RIM, and did not authorize that his name be used to establish RIM as a corporate entity.

44. Once the RIM accounts were created and verified by Victim-6 in reliance on the fabricated documentation described above, in or around January 2018, RIM successfully processed at least five transactions on Victim-6's electronic platform, totaling approximately $36,415.00. Each of these transactions charged credit cards issued by a financial services company known to law enforcement. An additional two transactions charging cardholders of the financial services company, totaling approximately $24,920, were attempted during this time period but were not successful. According to records that law enforcement obtained during the investigation, of these seven transactions, at least three were processed from a device using the 125 IP Address—which, again, was assigned to an internet service account registered to GRAHAM's residence in Princeton. At least two of the other transactions were processed from a device using an IP address ending in 117 (the "117 IP Address"). The investigation revealed that the 117 IP Address was assigned to an account registered to GRAHAM's mother-in-law (CC-1's mother) in Virginia.

45. The cardholders whose cards were charged disputed each of the foregoing successful transactions as fraudulent. As part of the dispute resolution process, Victim-6 requested that RIM provide documentation to substantiate the charges. In response, RIM submitted, through Victim-6's online portal, invoices corresponding to two of the disputed charges, totaling approximately $9,750. These invoices identified services related to personal protection and self-defense training services that RIM purportedly provided to a company located in or around Grand Junction, Colorado. The invoices bore what appeared to be Victim-3's signature, and indicated that they had been paid on January 18, 2018. The invoices were addressed to an individual referred to herein as "Cardholder-1," who was identified on the invoices as the president of a purported security company, which, according to the invoices,

received RIM's services. For example, one of the invoices (for $4,800) listed the following services that RIM had purportedly provided to the security company: "8 Hour intense hand defense training sessions – MKM"; "1 Day Training Seminar with instructor (2) for 10 client team members"; and "Misc. Personal Protection/training Products – Vests, Pads, personal protection gear."

46.    As received by Victim-6, the file name of the invoices (which had been submitted as one document) was "RIM, Merchant Submissions Invoices." When the document is opened, however, the file name that is displayed is "Vulcan Capital Corporation"—indicating that GRAHAM, not Victim-3, created and submitted the documents to Victim-6.

47.    The investigation has revealed that the invoices submitted to Victim-6 were false and fraudulent, and that all of the charges processed by RIM were fraudulent as well. For example, law enforcement interviewed Cardholder-1, the cardholder whose card was fraudulently charged a total of $9,750 on or about January 18, 2018, as described above. Cardholder-1 denied any knowledge of RIM Enterprises or GRAHAM, and, when shown copies of the invoices (which spelled Cardholder-1's name incorrectly), advised that s/he had never seen them. Cardholder-1 also denied operating the security company listed on the invoices; instead, Cardholder-1 advised that s/he worked as a manager for a contractor with the federal government that provided services in areas such as cyber security, information technology, and document production security. As such, Cardholder-1 denied having ordered or received $9,750 in personal protection goods and services. In addition, Victim-3 denied having signed the invoices that were submitted to Victim-6.

48.    Another cardholder whose card was charged was an individual referred to herein as "Cardholder-2," who incurred a fraudulent charge by Diomedes for $7,175 on or about January 19, 2018, and a second fraudulent charge by RIM for $6,915 on or about January 20, 2018. (Diomedes is another Vulcan entity described more fully in sub-section III.B, below.) Law enforcement interviewed Cardholder-2, who denied having received any services from either RIM or Diomedes, and s/he denied any knowledge of GRAHAM, Victim-3, RIM, or Diomedes. Cardholder-2 did inform law enforcement that s/he called a telephone number that appeared on his credit card statement associated with the charge from Diomedes, and that s/he spoke with GRAHAM. According to Cardholder-2, GRAHAM indicated that both RIM and Diomedes were his companies, further establishing that GRAHAM, not Victim-3, operated RIM in furtherance of the Payment Processing Scheme. GRAHAM further told Cardholder-2 that Diomedes was a company that offered a roofing system and that RIM provided training for the application of the roofing system (not self-defense training services).

49.    Before Victim-6 could take action on the fraudulent RIM charges, tens of thousands of dollars that Victim-6 had credited to the RIM accounts

was withdrawn and transferred to the RIM 2792 account that GRAHAM controlled. Bank records for that account reflected multiple transfers out of that account to other bank accounts controlled by GRAHAM and/or CC-1, as well as expenditures directly out of the RIM 2792 account that had no relation to the services that RIM had purportedly provided.

C.   Diomedes Partners

50.   Law enforcement's investigation also revealed that GRAHAM perpetrated the Payment Processing Scheme on Victim-6's platform through the above-mentioned Diomedes account. GRAHAM created two accounts with Victim-6 under the Diomedes name on or about December 17, 2017, and an additional account on or about January 3, 2018. Unlike the RIM accounts, GRAHAM established the Diomedes accounts using his own name, address, and contact and biographical information as the information associated with the accounts. Two external bank accounts were linked to the Diomedes accounts:  one ending in 5788 (the "Diomedes 5788 account") and one ending in 7047 (the "Diomedes 7047 account"), and both were controlled by GRAHAM and CC-1.

51.   As with the RIM accounts, Victim-6 requested, and GRAHAM submitted, certain documentation to verify the Diomedes accounts. To verify the accounts, GRAHAM submitted, via the 0965 fax number, several documents purporting to describe Diomedes's place in the Vulcan family of companies, and its business, which GRAHAM represented "focuses on Natural Resources, Energy; Water, Power and Technology." These materials included, among other things, a letter and lengthy information statements that provided information about the company and its business; purported invoices for services that Diomedes had ostensibly rendered; bank statements for the Diomedes 5788 account and the Diomedes 7047 account; and incorporation documents for the company.

52.   Also included with GRAHAM's submission was a brochure entitled "Carbon Leap: Energy Solutions for a Brighter Future; A Diomedes Partners, Ltd. Company." This brochure purported to be a marketing pamphlet for a Diomedes-sponsored "global coating technologies company that provides cost-effective energy saving solutions that meet the highest quality and environmental standards." The brochure included as a case study a "revolutionary" clean-energy roofing system that had been installed at two schools in the Broward County, Florida public school system. According to the brochure, these schools achieved significant energy savings as a result of the roofing installed by Carbon Leap. The brochure listed GRAHAM as the president of Carbon Leap.

53.   The Carbon Leap brochure was false and fraudulent and was submitted in furtherance of GRAHAM's Payment Processing Scheme.

In connection with its investigation, law enforcement contacted officials from the Broward County Public School System, who had no knowledge of any energy-saving roofing system installed by Carbon Leap. Indeed, the school system was unaware of having ever done business with Carbon Leap, Diomedes, GRAHAM, or any other Vulcan affiliate.

54.    After GRAHAM established the Diomedes accounts, several cardholders' credit cards were charged by Diomedes in fraudulent transactions. More specifically, on or about January 3, 2018, the Diomedes accounts successfully charged five different credit cards for more than $55,000. For at least two of the transactions, more than $20,000 was transferred from one of the Victim-6 accounts into the external Diomedes 5788 account that GRAHAM controlled. One of these fraudulent transactions, described in paragraphs 55 and 56, below, is described below.

55.    On or about January 3, 2018, Diomedes processed a charge on Victim-5's credit card in the amount of $11,500.00. This charge was processed from a device using the 125 IP Address, the IP address assigned to GRAHAM's Princeton residence. Victim-5 disputed that charge as fraudulent and, as part of the dispute resolution process, Victim-6 requested that GRAHAM provide information and documents about the transaction. In response, GRAHAM submitted to Victim-6 the following documents:

a.    An invoice, dated January 3, 2018 and purportedly addressed to Victim-5, for a charge in the amount of $11,500.00. The purported services noted on the invoice stated as follows: "Engineering Services and first Chemical Formulation Analysis for coating product for customer at locations – 01/03/18 SolarSave® Product: Reflectshield specifications – See Order Page. Services delivered for roof project 11048-01. Order taken via phone and e-mail. Services delivered via e-mail." The invoice bore the signature of Victim-4, whose title was listed as CFO. The invoice also contained a red box that read, "Paid via [Victim-6] – 1/3/2018." As explained below, Victim-4's signature on the invoice was forged.

b.    A product order form, dated January 3, 2018, with handwritten entries containing Victim-5's name, address, and the notation, "per e-mail/call." The form also identified, in handwriting, the type of services that Victim-5 had purportedly ordered: "Email – specs & coating and energy load savings analysis." The form further noted a delivery date of January 3, 2018, and that payment would be due on delivery. The product order form bore a handwritten cost for the "Enginerring [sic] Services and Technical Specifications" to be provided, in the amount of $11,500.00. Finally, handwritten notations on the line for the customer's signature read, "cc slip e-mail and confirmed by customer," and "see e-mail and cc slip from customer." The form bore the forged initials of Victim-4.

26

c.    A client credit card pre-authorization form, dated January 3, 2018, purportedly signed by Victim-5, and which ostensibly authorized his card to be charged by Diomedes in the amount of $11,500.00. The form contained Victim-5's name, address, credit card information, and signature authorizing the charge. As explained below, Victim-5's signature on this form was forged.

d.    Two printed e-mails purportedly between GRAHAM and Victim-5. These documents purported to show the e-mail correspondence in which Victim-5 provided the executed credit card authorization form, and GRAHAM's response, which purported to confirm that GRAHAM would forward the credit card form to Diomedes's CFO and that Victim-5's credit card would be charged. GRAHAM's e-mail to Victim-5 also indicated, "I understand that the specifications have already been forwarded to you via e-mail from our engineers."

56.    The investigation revealed (i) that the documents GRAHAM submitted to Victim-6 to substantiate the charge to Victim-5's credit card account were fabricated and fraudulent, and (ii) that GRAHAM processed the charge to Victim-5's card without having provided any services to Victim-5 whatsoever.

a.    Law enforcement interviewed Victim-5, the cardholder whose credit card Diomedes charged. Among other things, Victim-5:  (i) denied receiving any of the engineering services appearing on the invoice; (ii) denied ordering any such services; (iii) denied having received or ever having seen the invoice, credit card authorization, or product order form; (iv) denied signing or sending the credit card authorization to GRAHAM; (v) denied ever having spoken to or dealt with GRAHAM or Diomedes or any of its employees; and (vi) denied corresponding with GRAHAM via e-mail. Indeed, Victim-5 advised law enforcement that the e-mail address ascribed to him/her in the printed e-mails that GRAHAM submitted was not even his/her e-mail address.

b.    Law enforcement also interviewed Victim-4, whose name and signature appeared on the invoice submitted to Victim-6 that was purportedly issued to Victim-5, and whose initials appear on the related product order form submitted to Victim-6. Although Victim-4 formerly worked for GRAHAM as Vulcan's CFO, Victim-4 had not worked for GRAHAM or any Vulcan entity since at least 2014. Victim-4 also denied ever having worked for Diomedes. Victim-4 further denied having signed the Victim-5 invoice or having initialed the product order form, and Victim-5 disclaimed knowledge of anything having to do with the transaction in question.

57.    As with the transactions processed through the RIM accounts, before Victim-6 could take action to address the fraudulent transactions processed on Victim-5's credit card and other individual's credit cards,

GRAHAM successfully withdrew or transferred funds that had been credited by Victim-6 to the Diomedes 5788 account. Among other things, GRAHAM transferred or caused to be transferred fraudulently credited funds to CC-1's account, which then were used for, among other things, purchases that were personal in nature. Additionally, on or about January 8, 2018, GRAHAM transferred or caused to be transferred to a bank account controlled by a third party approximately $11,491.22 in funds credited to the Diomedes 5788 account as a result of the fraudulent transactions described above.

58.     Accordingly, there is probable cause to believe that GRAHAM committed the Payment Processing Scheme, and that, without lawful authority, GRAHAM used Victim-3's, Victim-4's, and Victim-5's means of identification in furtherance of that scheme, causing more than $60,000 in losses to Victim-6 and other payment processors.

IV.     THE BUSINESS E-MAIL COMPROMISE SCHEME

59.     Between in or around February 2017 and in or around June 2018, GRAHAM conspired with others to defraud victim institutions and individuals, including Victim-7, Victim-8, and Victim-9, each of whom was scheduled to make substantial outgoing wire transfers to third parties. In furtherance of the conspiracy, the co-conspirators sent fraudulent e-mail communications to the victims to induce them unknowingly to re-route those payments to bank accounts that GRAHAM and CC-1 controlled. As described below, GRAHAM intended to misappropriate the diverted funds for his, CC-1's, and his co-conspirators' personal benefit, use, and enrichment. In furtherance of the conspiracy, GRAHAM and his co-conspirators attempted to defraud Victim-7, Victim-8, and Victim-9 of a total of more than $6 million.

A.     Victim-7

60.     Victim-7, a municipal agency operating in or around Des Moines, Iowa, was obligated to make annual principal and interest payments on certain bonds. Each year, Victim-7 would make those bond payments via wire transfer to a financial services company ("Company A") that provides clearing and settlement services for the financial markets. In calendar year 2017, Victim-7 was required to make an annual bond payment of approximately $4.66 million.

61.     On or about November 29, 2017, representatives of Victim-7 corresponded via e-mail with Company A representatives regarding the 2017 annual bond payment. The representatives agreed that Victim-7 would make the 2017 bond payment on or before December 1, 2017. The representatives also verified that the funds would be wired to the same account into which Victim-7 had wired its bond payments in previous years.

62.    Shortly thereafter, on or about November 29, 2017, representatives of Victim-7 received follow-up communications from an e-mail account that appeared to be from the same Company A representatives referenced in paragraph 61, above, but which later was identified as a fraudulent e-mail account established by an unidentified co-conspirator (the "fake Company A e-mail account"). The follow-up e-mails from the fake Company A e-mail account advised Victim-7 that the designated bank account to which Victim-7 agreed to wire its bond payment was no longer active. Accordingly, the e-mail sent from the fake Company A e-mail account requested that Victim-7 instead make its bond payment to a different bank account, the details for which the sender provided in a document attached to the e-mail. That attachment identified the bank account number (ending in 9475) and routing number for the new designated bank account, held in the name of Nassau Energy Partners LLC (the "Nassau Energy Partners 9475 account").

63.    The investigation revealed that GRAHAM and CC-1 opened the Nassau Energy Partners 9475 account in or around February 2016, and at all times controlled that account. The account opening paperwork for that account represented that Nassau Energy Partners was an "energy finance company" with $14 million in annual gross sales. The investigation revealed that these representations were false. Law enforcement's review of the Nassau Energy Partners 9475 account, as well as several other bank accounts that GRAHAM and/or CC-1 established in the name of Nassau Energy Partners, identified no incoming deposits or payments consistent with legitimate commerce, and no account activity consistent with GRAHAM's representation that Nassau Energy Partners ever had annual sales approaching $14 million.

64.    The investigation revealed that the follow-up e-mails sent from the fake Company A representative were fraudulent, and had been sent to Victim-7 by one or more of GRAHAM's co-conspirators to induce Victim-7 inadvertently to re-route the 2017 debt payment to the Nassau Energy Partners 9475 account. The co-conspirator(s) structured the e-mails to appear legitimate, to deceive Victim-7 into routing its debt payment to the Nassau Energy Partners 9475 account, over which GRAHAM and/or CC-1 had control, so that members of the conspiracy could misappropriate the wired funds for their own personal use, benefit, and enrichment.

65.    Representatives of Victim-7 detected minor discrepancies between the legitimate e-mails from Company A and the fraudulent e-mails sent from the fake Company A e-mail account. Victim-7 representatives ultimately called Company A to confirm the correct wire instructions, and the 2017 debt payment was made to the verified Company A account and not to the Nassau Energy Partners 9475 account.

B.     Victim-8

66.     Victim-8 was a law firm operating in or around Nantucket, Massachusetts. In or around February 2018, Victim-8 represented the buyer in a real estate transaction. In that capacity, on or about February 13, 2018, representatives of Victim-8 received an e-mail communication with the law firm representing the seller, which provided the bank account information into which Victim-8 would wire its client's funds, anticipated to be approximately $700,000.

67.     Thereafter, between on or about February 13, 2018 and on or about February 14, 2018, Victim-8 received follow-up e-mail communications from an account purporting to be representatives of the law firm representing the seller referenced in paragraph 66, above, but which later was identified as a fraudulent e-mail account established by an unidentified co-conspirator (the "fake law firm e-mail account"). In these communications, the sender requested the Victim-8 representative instead to send the payment to an alternative bank account, and provided a bank account number (ending in 0071) and routing number for the new designated bank account, held in the name Aeolus Holdings (the "Aeolus 0071 account").

68.     The investigation revealed that GRAHAM, CC-1, and Victim-3 opened the Aeolus 0071 account in or around December 2017, and that GRAHAM and CC-1 had actual control over the account at all times. The account opening paperwork for that account represented that Aeolus Holdings was a "technology licensing company" with $150,000 in annual gross sales in 2017. The investigation revealed that these representations were false. Law enforcement's review of the Aeolus 0071 account, as well as several other bank accounts that GRAHAM and CC-1 established in the name of Aeolus Holdings, identified no incoming deposits or payments consistent with legitimate commerce, and no account activity consistent with GRAHAM's representation that Aeolus Holdings ever had annual sales approaching $150,000.

69.     The investigation revealed that the follow-up e-mails sent from the fake law firm e-mail account were fraudulent, and had been sent to Victim-8 by one or more of GRAHAM's co-conspirators to induce Victim-8 inadvertently to re-route the purchaser's funds to the Aeolus 0071 account. The co-conspirator(s) structured the e-mail to appear legitimate, to deceive Victim-8 into routing its client's funds to the Aeolus 0071 account, over which GRAHAM and CC-1 had control, so that members of the conspiracy could misappropriate the wired funds for their own personal use, benefit, and enrichment.

70.     During follow-up e-mail communications among the law firm representing the seller, Victim-8, and the fake law firm e-mail account, the fake law firm e-mail account again requested that Victim-8 change the recipient account, and provided account and routing information for another bank account, which turned out to be invalid. Victim-8 ultimately transmitted payment to the correct recipient account.

C.     <u>Victim-9</u>

71.     Victim-9 resided in or around Encinitas, California. In or around May-June 2018, Victim-9 contracted to purchase real estate located in Vista, California. In connection with that purchase, Victim-9 was scheduled to make a wire transfer of approximately $651,000 to the designated title company for the transaction.

72.     In connection with the transaction, a representative of the title company e-mailed wire instructions to Victim-9 instructing Victim-9 to wire the purchase funds to the title company's account at its own trust bank. Thereafter, however, Victim-9 received another e-mail, purportedly from the title company, directing Victim-9 instead to direct the funds to another account held at a different financial institution which, the investigation revealed, the title company did not use for its real estate transactions.

73.     On or about May 29, 2018, acting pursuant to the wire instructions in the second e-mail, Victim-9 authorized a wire transfer in the amount of $651,009 to be made from his/her account to the Diomedes 5788 account, which GRAHAM and CC-1 controlled. As described in paragraphs 50 through 57, above, GRAHAM used the Diomedes 5788 account in furtherance of the Payment Processing Scheme. The account opening paperwork for the Diomedes 5788 account represented that Diomedes Partners was engaged in "private lending" and had $25,000,000 in gross annual sales in 2017. (In contrast, as described in paragraph 51, above, GRAHAM represented to Victim-6 that Diomedes Partners "focuse[d] on Natural Resources, Energy; Water, Power and Technology.") The investigation revealed that these representations were false. Law enforcement's review of the Diomedes 5788 account, as well as several other bank accounts that GRAHAM and CC-1 established in the name of Diomedes Partners, identified no incoming deposits or payments consistent with legitimate commerce, and no account activity consistent with GRAHAM's representation that Diomedes ever had annual sales approaching $25,000,000.

74.     On or about June 1, 2018, three days after Victim-9's wire transfer posted to the Diomedes 5788 account, GRAHAM caused approximately $130,000 to be transferred from the Diomedes 5788 account to another account, held in the name of The Midden Group, Ltd., that he and CC-1 controlled. The same day, GRAHAM and/or CC-1 transferred or caused to be

transferred $10,000 of those funds from The Midden Group, Ltd. account to CC-1's account, which then was used for GRAHAM and CC-1's personal living expenses, including at an online retailer, a hardware store, a grocery store, department stores, a pet food store, and to a cellular telephone provider.[5] Additional funds also were transferred from CC-1's account to accounts held in the name of GRAHAM's children, which CC-1 controlled.

75.    On or about June 4, 2018, Victim-9's bank made a request to recall the wire transfer to the Diomedes 5788 account after Victim-9 realized that he/she had been defrauded. In connection with the recall request, GRAHAM falsely told his bank that he received the wired funds in connection with an oil deal, for which he was acting as "paymaster." GRAHAM also falsely represented to bank representatives that he needed to wire the funds to Hong Kong in connection with the transaction. These representations to the bank were false, and inconsistent with GRAHAM's near-immediate transfer of more than $130,000 in funds to the account held in the name of The Midden Group, the subsequent transfers to personal accounts held by GRAHAM and CC-1, and the personal expenditures from those accounts. Having determined that the wire transfer to the Diomedes 5788 account was fraudulent, the bank ultimately recouped almost $648,000 from various accounts under GRAHAM's and CC-1's control.

76.    Accordingly, there is probable cause to believe that GRAHAM and others conspired, through the Business E-Mail Compromise Scheme, to defraud victim institutions and individuals of money and property through materially false and fraudulent pretenses, representations, and promises transmitted by means of wire communication in interstate and foreign commerce.

---

[5]    The investigation revealed that GRAHAM also used the account held in the name of The Midden Group, Ltd. to receive funds fraudulently obtained through the Payment Processing Scheme.